401 F.2d 629
 SOUTHERN TOURS, INC. and Gulf Coast Motor Lines, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD and Amalgamated Transit Union
Local Division 1326, Amalgamated Transit Union,
AFL-CIO, Respondents.
 No. 25216.
 United States Court of Appeals Fifth Circuit.
 Oct. 7, 1968, Rehearing Denied Nov. 21, 1968.
 
 Wm. Terrell Hodges, Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for petitioners.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Richard N. Chapman, Atty., N.L.R.B., Washington, D.C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Michael N. Sohn, Atty., N.L.R.B., for respondents.
 Before THORNBERRY and SIMPSON, Circuit Judges and SUTTLE, District judge.
 THORNBERRY, Circuit Judge:
 
 
 1
 This case arose as a result of a series of unfair labor practices charged against Southern Tours, Inc. and Gulf Coast Motor Lines, Inc. (hereinafter referred to as 'the Company') by the Amalgamated Transit Union, Local Division 1326, AFL-CIO for violation of the National Labor Relations Act, 29 U.S.C. 158(a)(1), 158(a)(3), 158(a)(5). The Union alleged (a) that officials of the Company violated Section 8(a)(1) of the Act by coercively interrogating employees concerning their union activities, promising pay raises and other benefits conditioned on withdrawal from the Union, correcting grievances in order to induce withdrawals from the Union, creating the impression of surveillance, engaging in surveillance of union activities, and threatening to eliminate work and to furlough or discharge employees; (b) that the Company violated section 8(a)(3) by discharging three employees and temporarily suspending two others; and (c) that the Company failed to bargain in good faith with the Union in violation of section 8(a)(5).
 
 
 2
 With a few minor exceptions, the trial examiner found that the Company had violated the Act in each particular alleged in the complaint. The Board reversed in part and affirmed in part. The Board agreed that the Company failed to bargain in good faith in violation of section 8(a)(5). It also agreed that the Company had violated section 8(a)(1) in some respects, but disagreed in others. Finally, the Board reversed the examiner's finding that the Company unlawfully discharged two employees and suspended two others, but affirmed the finding that Wayne Hutchens had been discharged in violation of sections 8(a)(3) and (1). The Company appeals only that part of the Board's decision and order finding that Wayne Hutchens was unlawfully discharged. We enforce.
 
 I.
 Discharge of Wayne Hutchens
 
 3
 Wayne Hutchens suffers from a limp as a result of childhood polio. Nevertheless, he has successfully driven a bus for nineteen years and had been repeatedly and regularly certified as physically fit to drive. For the last nine years he has been employed by Gulf Coast Motor Lines, Inc. as a driver and has never been involved in an accident for which he was at fault. Although some of his leg muscles are impaired, he has developed a strong substitute muscular pattern that enables him to raise his foot sufficiently to rotate it between the accelerator and the brake pedal.
 
 
 4
 In April, 1966 Hutchens was asked by a passenger, who had noticed his limp, whether he had a doctor's certificate. Hutchens exhibited the certificate to the passenger, who raised no further complaint. Hutchens related the incident to terminal manager Chick, and Chick in turn mentioned the incident to the owner Shouppe. On May 5, Hutchens was called into Shouppe's office and questioned about the incident. Shouppe stated that because Hutchens' certificate had been challenged he would have to undergo another physical examination, to which Hutchens agreed. Shouppe made the necessary arrangements and told Dr. Clegg that Hutchens' right to drive had been challenged by a passenger who had noticed the limp. During the course of the examinations, Hutchens was asked to raise his right leg in a horizontal position, which he was unable to do. On the basis of this examination, Dr. Clegg advised Shouppe that Hutchens was not qualified to drive a bus. Hutchens was subsequently discharged.
 
 
 5
 The Company contends that Hutchens was discharged for cause within the meaning of section 10(c) of the Act since he failed to pass the physical examination required of drivers. We hold, however, that there is substantial evidence in the record as a whole to support the findings of the Board that Hutchens was discharged in violation of section 8(a)(3). Hutchens had initiated the organizing campaign and actively solicited employees to sign authorization cards over a two-month period. As the Board found, Shouppe and other Company officials exhibited extreme antiunion hostility. This antiunion animus could properly be considered by the Board in determining that the discharge was motivated by Hutchens' union activities. See NLRB v. O. A. Fuller Super Markets, Inc., 5th Cir. 1967, 374 F.2d 197, 200; NLRB v. Brennan's Inc., 5th Cir. 1966, 366 F.2d 560, 564; NLRB v. Durant Sportswear, Inc., 5th Cir. 1966, 358 F.2d 729, 730; NLRB v. Plant City Steel Corp., 5th Cir. 1964, 331 F.2d 511, 514.
 
 
 6
 There was evidence in the record that Shouppe knew Hutchens played a dominant role in the union campaign. Shouppe interrogated the employees extensively and kept active surveillance of the union activities. These factors are significant in determining whether there is a reasonable inference that the Company knew of Hutchens' activities. See NLRB v. Durant Sportswear, Inc., 5th Cir. 1966, 358 F.2d 729, 730. Moreover, there was direct evidence that Shouppe learned of Hutchens' dominant role in the union compaign from interrogation of one of the employees.
 
 
 7
 The Company's main argument is that Hutchens was discharged after he failed to pass the physical examination in May, 1966. Hutchens was scheduled to take a physical examination in any event in November 1966 since his medical certificate expired then. The Company argues that he was required to take the accelerated examination because one passenger asked to see his medical certificate, and Shouppe therefore became fearful of the possible reaction of a jury to Hutchens' limp in the event of some future lawsuit. There is evidence in the record to indicate, however, that Shouppe learned of Hutchens' limp and asked to see his medical certificate five months prior to the accelerated examination. Thus if Shouppe was really concerned about the possible adverse legal effect of a bus driver with a limp, he might have required Hutchens to take a physical examination immediately. Moreover, if the passenger's inquiry had really triggered concern over jury reactions, one could expect that all drivers with visible infirmities would have been sent for immediate reexamination. Yet the Company exhibited no like concern with respect to Swickheimer, who also drove a bus and who had a limp and wore a brace on one of his legs. Therefore, we find that the proximity in time of the accelerated examination to Hutchens' union activity and the dissimilar treatment of Swickheimer constitute substantial evidence on which the Board could have concluded that the discharge was discriminatory and not for cause.
 
 II.
 The Board's Order
 
 8
 The Company contends that the Board's order is punitive in that it requires Hutchens to be examined by another doctor, and in the event he fails the second examination, requires the Company to employ him as a freight or ticket agent in Clearwater. Moreover, if employment of Hutchens in either of these capacities is unavailable and if Hutchens does not want to accept any other employment with the Company, the order requires that Hutchens be made whole until he obtains suitable employment with another employer.
 
 
 9
 The first attack is aimed at the requirement that Hutchens be reexamined by another doctor. The Company argues that Dr. Clegg's medical findings are unimpeached and that the contract between the Union and the Company specifies that physical examinations are to be made by a doctor selected by the Company. The Board found that Shouppe's statement to Dr. Clegg that he was sending over a bus driver whose ability to drive had been challenged because of his limp created possible prejudicial effects. Dr. Clegg's recommendation supports this finding in light of the fact that in the nineteen previous years doctors had certified his ability to drive a bus. Moreover, the unlawful discrimination and discharge of Hutchens antedated the contract between the Company and the Union by ten months so that the contractual provisions are inapplicable. Therefore, we find that the Board's requirement of a reexamination is reasonable and necessary to insure neutrality and fairness.
 
 
 10
 Assuming that Hutchens fails the reexamination ordered by the Board, the Company must then comply with the remainder of the order, which it says is punitive because it goes beyond restoring the status quo and requires that more be done than would have been done if the employee had failed his physical examination in the normal course of things. In November, 1966, so the argument goes, Hutchens would, by hypothesis, have failed the physical and been lawfully discharged. Therefore, the Company's only duty should be to make him whole for economic loss sustained between May, 1966 and November, 1966. In the case of a discriminatory discharge the Board is empowered to effectuate the broad policies of the Act by restoring the situation as nearly as possible to that which would have obtained but for the illegal conduct. Generally, effectuation of these important policies requires not only compensation for the loss of wages but also an offer of employment to the victim of discrimination. Phelps Dodge Corp. v. NLRB, 1941, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271, 1283, 133 A.L.R. 1217. In other words, the Board can and normally does require reinstatement with backpay. In this case, however, reinstatement to the former job of bus driver would be impossible because we are assuming Hutchens is medically unqualified, but we believe the Board was entitled to assume that absent its hostility toward union activists the Company would have placed an employee with nine-years' tenure somewhere else in the system when he failed the examination. Deferring to the Board's discretionary authority to gauge the situation that would have obtained but for the illegal conduct and considering its overriding duty to preserve the rights of self-organization for all employees, we believe the requirement that Hutchens be employed as a freight or ticket agent in Clearwater was not unreasonable.[1]
 
 
 11
 If employment as freight or ticket agent is unavailable and if Hutchens does not want any other employment with the Company, then he must be paid until he obtains suitable employment elsewhere. Again, we believe this part of the order was reasonably calculated to restore the situation that would have obtained but for the illegal conduct. If Hutchens had failed his physical examination in November, 1966, he would have been able to seek another job with the Company at that time. His opportunity to find one at that time, is, as a result of the illegal conduct, forever gone and it cannot be known whether he would have found one. Bearing this in mind and again deferring to the Board's discretion, which surely includes discretion to make certain assumptions in favor of the victim of illegal discrimination in this kind of situation, we believe the Board could reasonably assume that Hutchens would have been placed somewhere in the Company's system in November, 1966 and on that assumption could reasonably require that if there is no job for him at such future time as compliance with the order is undertaken, then he must be paid until he finds suitable employment elsewhere.
 
 
 12
 In summary, we believe the entire order was reasonably designed to restore the situation that would have obtained but for the illegal conduct and therefore was not punitive. We are not as apprehensive as the Company that it will, in effect, be paying Hutchens a lifetime pension. He is required to make every reasonable effort to find substantially equivalent employment and would not be entitled to backpay for any period of time in which he neglected to do so. See NLRB v. Mooney Aircraft, Inc., 5th Cir. 1966, 366 F.2d 809, 813; NLRB v. Miami Coca-Cola Bottling Co., 5th Cir. 1966, 360 F.2d 569, 575. Also, the Board's order should not be interpreted to require the Company to place Hutchens as a freight or ticket agent if he is unable to perform in either of those capacities and should not be interpreted to require the continuance of compensation if he is physically incapable of performing substantially equivalent employment. See e.g., Better Monkey Grip Co., 115 N.L.R.B. 1170, enforced, 5th Cir. 1957, 243 F.2d 836.
 
 
 13
 Enforced.
 
 
 
 [1]
 An employee who has been discharged in violation of the Act assumes a peculiar status. The Board has very broad discretion in vindicating the Act through him. Waterman S.S. Corporation v. NLRB, 5th Cir. 1941, 119 F.2d 760. Thus, an offending company cannot escape its duty to reinstate illegally discharged employees when their former positions have been abolished. It must offer them substantially equivalent employment. NLRB v. Missouri Transit Co., 8th Cir. 1957, 250 F.2d 261; NLRB v. Cowell Portland Cement Co., 9th Cir. 1945, 148 F.2d 237